# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **JAMEY LEE DYE,** | ) | |
| Plaintiff | ) | Civil Action No. 1:20cv00066 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Jamey Lee Dye, ("Dye"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Dye protectively filed his application for DIB[2] on January 10, 2019, alleging disability as of November 16, 2017, based on lower back pain; degenerative disc disease; nerve damage in his back; depression; anxiety; and migraine headaches. (Record, ("R."), at 12, 180-81, 208.) The claim was denied initially and upon reconsideration. (R. at 118-20, 124-26, 129-32, 134-36.) Dye then requested a hearing before an administrative law judge, ("ALJ"). (R. at 137-38.) The ALJ held a hearing on July 29, 2020, at which Dye was represented by counsel. (R. at 35-63.)

---

[2] On December 10, 2014, Dye filed an application for DIB, and on December 14, 2015, he filed an application for supplemental security income, ("SSI"), alleging disability as of December 3, 2014. (R. at 67.) By decision dated November 15, 2017, the ALJ denied Dye's claims. (R. at 67-79.) There is no indication that Dye appealed this decision.

In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same...title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999). Those standards have been superseded by 20 C.F.R. § 404.1520c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous 2017 decision and found it to be "partially persuasive." (R. at 26.) The ALJ noted the current record indicated more significant lumbar and cervical degeneration and hand issues, which could have caused Dye's physical issues to have worsened. (R. at 26.)

By decision dated August 31, 2020, the ALJ denied Dye's claim. (R. at 12-28.) The ALJ found Dye met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 14.) The ALJ found Dye had not engaged in substantial gainful activity from November 16, 2017, the alleged onset date, through December 31, 2019, the date last insured.[3] (R. at 15.) The ALJ determined that, through the date last insured, Dye had severe impairments, namely degenerative disc disease; ulnar neuropathy in the right upper extremity; bilateral carpal tunnel syndrome; depression; and anxiety, but he found Dye did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.)

The ALJ found that, through the date last insured, Dye had the residual functional capacity to perform sedentary[4] work, except he could sit one hour before shifting to a standing position; he could stand and/or walk one hour before shifting to a seated position; he could frequently operate hand controls, bilaterally; he could frequently reach, including overhead, on the right; he could frequently handle and finger, bilaterally; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he could never climb ladders, ropes or scaffolds, work at unprotected heights or around hazardous machinery; he could occasionally work around vibrations; he could understand, remember and carry out simple instructions and make simple work-related decisions in two-hour blocks; he could tolerate occasional changes in a routine work setting; and he must use a cane for prolonged ambulation. (R. at 17.) The ALJ found that, through the date last insured, Dye was

---

[3] Therefore, Dye must show he was disabled between November 16, 2017, the alleged onset date, and December 31, 2019, the date last insured, to be eligible for benefits.

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. See 20 C.F.R. § 404.1567(a) (2020).

unable to perform his past relevant work. (R. at 26.) Based on Dye's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Dye could perform, including the jobs of a surveillance monitor, a document preparer and an addresser. (R. at 26-27, 58-60.) Thus, the ALJ concluded Dye was not under a disability as defined by the Act from November 16, 2017, the alleged onset date, through December 31, 2019, the date last insured, and he was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Dye pursued his administrative appeals, (R. at 175-76), but the Appeals Council denied his request for review. (R. at 1-5.) Dye then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Dye's motion for summary judgment filed July 9, 2021, and the Commissioner's motion for summary judgment filed March 14, 2022.

## II. Facts

Dye was born in 1981, (R. at 180), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and past work as a line repairer and a block layer/setter. (R. at 45-46, 53, 209.) Dye testified he used a cane three or four days a week due to pain and tingling in his back and both arms and legs. (R. at 49.) He reported he took care of his daughter, including helping her study and attending her softball games; house cleaning; doing laundry and dishes; mowing the lawn with a riding lawnmower; and preparing meals. (R. at 226-27, 229, 514.) Dye reported hunting animals to supplement his food needs, and he denied any issues with his activities of daily living. (R. at 511, 514.)

In rendering his decision, the ALJ reviewed records from Dr. Robert McGuffin, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Nicole Sampson, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; University of Virginia Health System, ("UVA"); Cumberland Mountain Community Services, ("Cumberland Mountain"); Abingdon Psychological Services, P.C.; Hansonville Community Medical Care; Starting Point Treatment Center; and Orthopedics of SW Virginia.

From January 2017 through May 2020, Dye was treated by Rebecca Barton, N.P., a nurse practitioner at Hansonville Community Medical Care, for low back pain with stiffness after prolonged sitting and standing; numbness in his lower leg; depression; hypertension; gastroesophageal reflux disease, ("GERD"); migraine headaches; paresthesia in both lower extremities; right elbow pain; a left thumb injury; and hypothyroidism.[5] (R. at 355-491, 529-35, 548-86, 632-62, 742-66.) In January 2017, Dye described his depression as severe and stated he was dealing with personal issues, such as a divorce and a child custody battle. (R. at 355.) On March 18, 2017, an MRI of Dye's cervical spine showed multi-level degenerative changes of the lumbar spine, worst at the C5-C6 and C6-C7 disc spaces with mild central canal and moderate bilateral foraminal stenosis. (R. at 451-53.) An MRI of Dye's thoracic spine showed marked dextrocurvature[6] of the thoracic spine centered at the T7 level and a lesion in the right lobe of the liver.[7] (R. at 451-53.) An MRI of Dye's

---

[5] On April 4, 2019, an ultrasound of Dye's thyroid showed a solid nodule in the mid right thyroid lobe. (R. at 538.) Based on the small size of the nodule, no follow up was recommended. (R. at 538.)

[6] Dextrocurvature or dextroscoliosis is a type of scoliosis that results in a sideways curve of the spinal column to the right. *See* https://www.healthline.com/health/dextroscoliosis (last visited Mar. 29, 2022).

[7] In April 2017, Dye saw Dr. Patrick Northup, M.D., a physician at UVA, for evaluation of a liver lesion. (R. at 618-22.) Based on Dye's normal liver enzymes and no evidence of other liver problems, Dr. Northup reported the lesion likely was benign. (R. at 622.)

lumbar spine showed multi-level degenerative changes, worst at the L5-S1 level, where a mild diffuse disc bulge with a superimposed left paracentral foraminal disc protrusion was causing severe left lateral recess stenosis and compression of the descending S1-S2 nerve roots, moderate right recess stenosis with compression of the descending S1 nerve root and moderate right and severe left foraminal stenosis; and mild central canal stenosis at the remaining levels. (R. at 451-53.)

Examinations showed Dye was anxious and appeared to be in moderate pain; he had decreased range of motion and pain with back flexion and extension; his low back had tenderness to palpation; he had a mildly antalgic gait; he was fully oriented; he had an appropriate affect and demeanor; and he appeared to be moderately depressed. (R. at 356-57, 360, 364, 368-69, 372, 376, 379-80, 384, 388, 392, 396, 401, 406, 411, 420, 426, 431, 650, 660.) Dye repeatedly reported medication was helping his depression, pain, hypertension and GERD, which allowed him better functional ability and quality of life. (R. at 355, 359, 367, 371, 374, 378, 382, 386, 390, 394, 399, 404, 409, 414, 418, 424, 429, 434, 444, 529, 550, 557, 563, 576, 582, 632, 648, 658, 742, 747, 753, 758.)

On April 28, 2017, Dye was evaluated at UVA for low back and neck pain. (R. at 294.) He reported his neck pain caused migraine headaches and bilateral arm and hand pain, numbness and tingling. (R. at 294.) Dye ambulated with a normal gait, without any assistive device; he had no lumbar tenderness and intact range of motion; he had intact sensation and full motor strength in both lower extremities; and straight leg raising tests were negative. (R. at 296.) X-rays of Dye's lumbar spine showed lumbar spondylosis, most advanced at the L5-S1 level, and x-rays of Dye's cervical spine showed cervical spondylosis, most advanced at the C6-C7 disc space. (R. at 303-05.) He was diagnosed with neck, bilateral arm and low back pain; bilateral lower extremity pain; cervical degenerative disc disease at the C5-C7 disc

space; lumbar degenerative disc disease, most predominantly at the L5-S1 level; and lumbar stenosis. (R. at 297.) Surgical intervention was not predictable for improvement of low back pain, and conservative treatment was recommended, including physical therapy, anti-inflammatories and possibly injections. (R. at 297.)

On January 4, 2018, Barton completed a medical assessment, finding Dye could rarely[8] lift and carry items weighing up to 10 pounds; he could sit, stand and/or walk up to 15 minutes each in an eight-hour workday and would need to lie down the rest of the workday; he could rarely use his hands to reach, to handle, to finger, to feel and to push and pull; he could rarely use his feet to operate foot controls; he could rarely climb, balance, stoop, kneel, crouch and crawl; he could rarely work at unprotected heights, work around moving mechanical parts, operate a motor vehicle, work around dust, odors, fumes and pulmonary irritants, temperature extremes and vibrations; and he could work around moderate noise, such as in an office setting. (R. at 588-92.) She opined he was unable to work. (R. at 592.) That same day, Barton completed a pain assessment, finding Dye's pain would distract him so that he could not adequately perform daily activities or work; walking, standing and bending greatly increased his pain, causing abandonment of tasks related to daily activities or work; and medication severely limited his effectiveness in the workplace due to distractions, inattention and drowsiness. (R. at 594.)

On December 3, 2018, Dye saw Barton, reporting right elbow pain. (R. at 434.) Dye was anxious; he had decreased range of motion in the right elbow; he had decreased range of motion with back flexion and extension; he had pain with right elbow and forearm extension; his low back was tender to palpation; his gait was mildly antalgic; he was fully oriented; and he was moderately depressed. (R. at 436.)

---

[8] Rarely is defined as one percent to five percent of an eight-hour workday. (R. at 588.)

Conservative treatment was recommended for Dye's low back pain, and he received a steroid injection for his elbow pain. (R. at 438.) On December 31, 2018, Dye reported he cut his thumb while skinning a bear skull. (R. at 440.) His examination remained the same, except Dye's left thumb had pain to palpation, with redness and swelling, and he had swelling radiating up his forearm. (R. at 442.) Barton sent Dye to the emergency room for possible osteomyelitis of the left thumb. (R. at 442.)

On February 4, 2019, Dye was seen at Cumberland Mountain, requesting Suboxone treatment.[9] (R. at 499-510.) He reported he was receiving medication assisted therapy at Southwest Virginia Recovery Center, but the organization would not take his insurance. (R. at 499.) Dye reported his opioid addiction and dependency increased when he sustained a severe work-related back injury. (R. at 499.) He stated he was "using pain pills" prior to his back injury. (R. at 500.) Dye did not use an assistive device to ambulate; he was casually dressed and appropriately groomed; his mood and affect were euthymic; his speech, thought content, thought process and memory were normal; he was fully oriented; he had no paranoia, delusions or hallucinations; and his judgment and insight were good. (R. at 500, 504-05.) On February 27, 2019, Dye reported depression since losing his job. (R. at 512.) Dye was diagnosed with opioid use disorder, moderate; major depressive disorder, recurrent episode, mild; and tobacco use disorder, moderate. (R. at 515.) His examination findings remained unchanged, except his mood and affect were fair. (R. at 516-17.)

On April 4, 2019, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, indicating Dye had the residual functional capacity

---

[9] In December 2019 and January and February 2020, Dye was seen at Starting Point Treatment Center, where it was reported he was stable, he maintained good, sustained recovery, he was motivated in sobriety, and he was compliant with treatment protocols. (R. at 664-75.)

to perform light[10] work; stand and/or walk a total of four hours in an eight-hour workday; sit a total of six hours in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb, balance, stoop, kneel, crouch and crawl; and he should avoid concentrated exposure to vibration and work hazards, such as machinery and heights. (R. at 92-94.) No manipulative, visual or communicative limitations were noted. (R. at 93.) On July 12, 2019, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. McGuffin, except he found Dye could frequently balance and had no environmental limitations. (R. at 107-08.)

On April 4, 2019, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Dye had no limitations in his ability to understand, remember or apply information, to interact with others and to adapt or manage himself; and mild limitations in his ability to concentrate, persist or maintain pace. (R. at 90-91.) Milan concluded Dye's substance addiction disorders and depressive, bipolar and related disorders were not severe. (R. at 90.) Milan opined Dye could perform all types of work. (R. at 90-91.) On July 12, 2019, Nicole Sampson, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Milan, except she found Dye also had mild limitations in his ability to adapt or manage himself. (R. at 105-06.)

On April 29, 2019, Ralph Ramsden, Ph.D., a licensed clinical psychologist with Abingdon Psychological Services, P.C., evaluated Dye at the request of Dye's attorney. (R. at 624-26.) Dye frequently shifted in his chair throughout the evaluation due to pain; he had a slight off-centered posture, possibly related to chronic neck

---

[10] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

issues; he expressed himself clearly; he had good hygiene; he exhibited no perceptual problems; and he had a depressed mood and affect. (R. at 625.) Ramsden diagnosed major depressive disorder, single episode, severe. (R. at 626.)

On May 20, 2019, Dye saw Barton, reporting lower back and neck pain with bilateral upper extremity paresthesia. (R. at 529.) He reported some pain relief with NSAIDS. (R. at 529.) Dye was anxious; he had decreased range of motion in the right elbow; he had decreased range of motion and pain with back flexion and extension; he had pain with his right elbow and forearm extension; he had hypoesthesia; he was fully oriented; his affect and demeanor were appropriate; and he was moderately depressed.[11] (R. at 531.) Barton recommended conservative treatment for Dye's low back pain, including alternating cold packs and moist heat, massage and home back strengthening exercises.[12] (R. at 533.) On June 6, 2019, an MRI of Dye's cervical spine showed a small left subarticular disc extrusion at the C5-C6 disc space with mild left-sided foraminal stenosis and minimal compression of the cervical cord; and a minimal concentric disc bulge at the C6-C7 disc space with a small uncinate spur on the left with mild left-sided foraminal stenosis. (R. at 539-40.) An MRI of Dye's lumbar spine showed degenerative disc space narrowing with degenerative endplate changes at the L5-S1 level; a prominent disc bulge causing bilateral foraminal stenosis, moderate on the left and mild on the right; and a concentric annular tear in the posterior disc margin at the L2-L3 level. (R. at 541-42.)

---

[11] Dye's examination findings remained unchanged at subsequent office visits, except in September 2019, when he had stiffness and decreased range of motion in his neck, and in January, February, March and April 2020, he had tenderness in the posterior neck and shoulder with associated spasms and left knee pain. (R. at 552, 559, 578, 584, 635, 644, 655, 744, 749.) He continued to report pain relief with medication. (R. at 550, 557, 576, 582, 758.)

[12] In July 2019, Barton ordered physical therapy for Dye's cervical and lumbar pain. (R. at 716.) He participated in therapy from July 22, 2019, through August 28, 2019. (R. at 717-41.)

From June 2019 to March 2020, Dye participated in individual therapy at Abingdon Psychological Services, P.C., for severe depression and mild anxiety due to his inability to work. (R. at 543-47, 713-15.) During this time, Dye was well-groomed; he was cooperative; his motor activity was normal;[13] his mood was depressed and anxious[14] with an appropriate affect; his speech was normal; his thought process was intact; he was fully oriented; and his memory, judgment and insight were intact. (R. at 543-47, 713-15.) His mood was improved and stable. (R. at 543-47, 713-15.)

On July 2, 2019, Dr. Gregory A. Helm, M.D., a neurosurgeon at UVA Spine Center, examined Dye for his complaints of cervical and lumbar pain. (R. at 706.) Dye had good strength in his upper and lower extremities, and he had mild diffuse numbness in his hands. (R. at 706.) Dr. Helm was hesitant to recommend surgery because Dye had not tried all conservative treatment, and he prescribed lumbar and cervical physical therapy. (R. at 706.)

On January 27, 2020, Dr. Chauncey Santos, M.D., a physician with Orthopedics of SW Virginia, saw Dye for complaints of numbness and tingling in his fingers. (R. at 707-09.) An electromyography, ("EMG"), and nerve conduction study, performed on January 21, 2020, showed mild median nerve neuropathy, bilaterally, affecting all the sensory fibers; and moderate right ulnar nerve neuropathy involving sensory and motor fibers. (R. at 627-30, 707.) Dr. Santos diagnosed bilateral carpal tunnel syndrome and ulnar neuropathy of the right elbow. (R. at 708.) Dr. Santos provided wrist braces and recommended Dye rest and avoid

---

[13] In September 2019, motor activity was normal, but he walked with noticeable difficulties. (R. at 543.)

[14] In November 2019, Dye's mood was euthymic. (R. at 715.)

putting pressure on his elbow. (R. at 708.) He also stated it would take approximately six to 12 months for Dye's condition to improve. (R. at 708.)

On March 5, 2020, Ramsden completed a mental assessment, finding Dye had no limitations in his ability to remember locations and work-like procedures and to understand, remember and carry out short, simple instructions. (R. at 772-74.) He opined Dye had mild limitations, but could function well, in his ability to sustain an ordinary routine without special supervision; to work with or near others without being distracted by them; and to make simple work-related decisions. (R. at 772.) Ramsden found Dye had moderate limitations, resulting in a satisfactory ability, to understand, remember and carry out detailed instructions and to maintain attention and concentration for extended periods. (R. at 772.) He opined Dye had a seriously limited, to no useful ability, to perform activities within a schedule, maintain regular attendance and be punctual and to perform at a consistent pace. (R. at 772.) Ramsden found Dye had no useful ability to complete a normal workday or workweek. (R. at 772.) He opined Dye's ability to respond appropriately to supervision, co-workers and work pressures in a work setting was not affected by his impairments. (R. at 773.) Ramsden found Dye would be absent from work more than 15 days a month. (R. at 774.)

On June 30, 2020, Barton completed a medical assessment, finding Dye could rarely lift and carry items weighing up to 20 pounds, up to 10 pounds occasionally and never lift and carry items weighing more than 20 pounds; he could sit, stand and/or walk[15] up to two hours each in an eight-hour workday and he could do so up to one hour without interruption, noting Dye must rest at least 15 minutes per hour; he could rarely use his hands to reach overhead; he could occasionally use his hands

---

[15] Barton noted Dye used a cane to ambulate when his pain was worse. (R. at 768.)

to reach in all other directions; he could frequently use his hands to handle, to finger and to feel; he could never use his hands to push and pull; he could occasionally use his feet to operate foot controls; he could rarely climb stairs and ramps, balance and kneel; he could never climb ladders or scaffolds, stoop, crouch and crawl; he could frequently work around dust, odors, fumes and pulmonary irritants; he could occasionally operate a motor vehicle, work around vibrations and loud noise, such as heavy traffic; and he could never work at unprotected heights or around moving mechanical parts and temperature extremes. (R. at 767-71.) She stated she did not know what Dye's absenteeism from work would be, as it was undetermined due to his illness. (R. at 771.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Dye argues the ALJ erred by improperly determining his residual functional capacity by substituting his opinion for that of his treating and examining medical sources. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-8.) Specifically, Dye argues the ALJ should have limited him to less than occasional use of his hands. (Plaintiff's Brief at 4.) Dye also argues substantial evidence does not exist to support the ALJ's mental residual functional capacity finding. (Plaintiff's Brief at 3, 6-7.) Dye next contends the ALJ should have ordered a consultative examination. (Plaintiff's Brief at 7-8.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations

governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[16]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must

---

[16] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[17] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of

---

[17] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Dye argues the ALJ erred by improperly determining his residual functional capacity by substituting his opinion for that of his treating and examining medical sources. (Plaintiff's Brief at 3-8.) Specifically, Dye argues the ALJ should have limited him to less than occasional use of his hands. (Plaintiff's Brief at 4.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2020). The ALJ found that, through the date last insured, Dye had the residual functional capacity to perform sedentary work, except he could sit one hour before shifting to a standing position; he could stand and/or walk one hour before shifting to a seated position; he could frequently operate hand controls, bilaterally; he could frequently reach, including overhead, on the right; he could frequently handle and finger, bilaterally; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he could never climb ladders, ropes or scaffolds, work at unprotected heights or around hazardous machinery; he could occasionally work around vibrations; he could understand, remember and carry out simple instructions and make simple work-related decisions in two-hour blocks; he could tolerate occasional changes in a routine work setting; and he must use a cane for prolonged ambulation. (R. at 17.)

In making his residual functional capacity finding, the ALJ found Barton's 2018 medical assessment "not persuasive" and her 2020 medical assessment "partially persuasive." (R. at 24, 588-92, 767-71.) In her 2020 assessment, Barton found Dye could rarely use his hands to reach overhead; he could occasionally use his hands to reach in all other directions; he could frequently use his hands to handle, to finger and to feel; and never use his hands to push and pull. (R. at 768.)

In April 2017, Dye was evaluated at UVA for low back and neck pain. (R. at 294.) He reported bilateral arm and hand pain, numbness and tingling. (R. at 294.) Dye first complained of right elbow pain and swelling to Barton in December 2018. (R. at 434.) His examinations showed he had decreased range of motion in his right elbow and pain with right elbow and forearm extension through February 2019. (R. at 436, 442, 446.)  In May 2019, Dye complained of neck pain that radiated into both arms, as well as bilateral upper extremity paresthesia. (R. at 529.) Barton reported Dye continued to have decreased range of motion in his right elbow and pain with right elbow and forearm extension, along with hypoesthesia. (R. at 531.) Barton's examination findings remained the same throughout 2019. (R. at 552, 559, 578, 584, 655.) In January, February, March and April 2020, Barton reported Dye had tenderness in the posterior neck and shoulder with associated spasms. (R. at 635, 644, 744, 749.)

Although the ALJ found Barton's 2020 assessment "partially persuasive," he found the record did not show significant hand issues to justify Barton's assessed manipulation limitations. (R. at 24.) Yet, when discussing the state agency physicians' assessments, the ALJ noted they did not place any manipulation limitations on Dye's work-related abilities, "but the later records show carpal tunnel syndrome." (R. at 24.) Therefore, the ALJ found the state agency physicians' assessments "partially persuasive." (R. at 24.) Based on this, the ALJ found Dye could frequently operate hand controls, bilaterally; frequently reach, including overhead on the right; and frequently handle and finger, bilaterally. (R. at 17.) As noted above, objective testing shows Dye has a small left subarticular disc extrusion at the C5-C6 disc space with mild left-sided foraminal stenosis and minimal compression of the cervical cord; and a disc bulge at the C6-C7 disc space with a small uncinate spur on the left with mild left-sided foraminal stenosis. (R. at 539-40.) An EMG and nerve conduction studies, conducted in January 2020, showed

mild median nerve neuropathy, bilaterally, affecting all the sensory fibers; and moderate right ulnar nerve neuropathy involving sensory and motor fibers. (R. at 627-30.) Dye was prescribed wrist braces and advised to rest and to avoid putting any pressure on his elbow. (R. at 708.) Dr. Helm noted it would take Dye approximately six to 12 months for his condition to improve. (R. at 708.) It further is noted that Dye testified he is right-hand dominant. (R. at 45.) While Dr. Santos's opinion was rendered after Dye's last insured date, the record shows that he was complaining of nerve entrapment symptoms since 2017. (R. at 294.) Of note, the ALJ's opinion incorrectly states that Dye did not complain "much about his hands" prior to 2019. (R. at 23.) Also, the ALJ's opinion does not even address Dr. Santos's instruction that Dye needed to rest his hands and wrists and avoid putting pressure on his elbow. Based on this, I cannot find substantial evidence exists to support the ALJ's consideration of the opinion evidence and his finding that Dye could frequently operate hand controls, bilaterally; frequently reach, including overhead on the right; and frequently handle and finger, bilaterally.

I do find substantial evidence exists to support the ALJ's consideration of the mental opinion evidence and his resulting mental residual functional capacity finding. The ALJ found Dye could understand, remember and carry out simple instructions and make simple work-related decisions in two-hour blocks; and he could tolerate occasional changes in a routine work setting. (R. at 17.) In making this finding, the ALJ found Ramsden's March 2020 mental assessment "partially persuasive." (R. at 25.) The ALJ noted Ramsden's assessment "seems to limit" Dye's work-related mental abilities based on his physical conditions. (R. at 25.) Dye's examination findings routinely showed he had a depressed mood and affect, but he was fully oriented; he was well-groomed and cooperative; and his speech, thought content, thought process, memory, judgment and insight were intact. (R. at 436, 442, 504-05, 543-47, 625, 713-15.) Furthermore, Dye consistently reported

medication was helping his depression, pain, hypertension and GERD, which allowed him better functional ability and quality of life. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Based on the above, I cannot find substantial evidence exists to support the ALJ's consideration of the medical opinion evidence and his resulting physical residual functional capacity finding, and I will recommend the court remand Dye's claim to the Commissioner for further consideration. Based on my finding on this issue, I will not address Dye's remaining arguments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence as to Dye's mental residual functional capacity;

2. Substantial evidence does not exist in the record to support the ALJ's consideration of the opinion evidence as to Dye's physical residual functional capacity; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that Dye was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Dye's motion for summary judgment and the Commissioner's motion for summary judgment, vacate the

Commissioner's decision denying benefits and remand Dye's claim to the Commissioner for further development.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     March 29, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE